UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

BURN FITNESS, LLC

    Debtor.

Chapter 11
Case No. 21-43828-MAR
Hon. Mark A. Randon

*Joint Administration Requested*

/

# DECLARATION OF ALYSSA TUSHMAN
# IN SUPPORT OF CHAPTER 11 PETITIONS OF BURN FITNESS, LLC, BURN FITNESS-2, LLC AND BURN FITNESS-3, LLC, FIRST DAY MOTIONS AND OTHER MOTIONS

I, Alyssa Tushman, make this declaration under 28 U.S.C. §1746:

1.    I am a 51% member of Burn Fitness Holdings LLC, which is the sole member of each of the Debtors.[1] I am the Manager of the Debtors, and have been so since the inception of each Debtor.

2.    I am knowledgeable and familiar with the business and finances of the Debtors. Unless otherwise stated in this Declaration, these statements of fact are based on my personal knowledge, my review of relevant documents, information provided to me by my employees, working either directly or indirectly under my

---

[1] The Debtors in these proposed jointly administered cases are Burn Fitness, LLC, Chapter 11 Case No. 21-43828, filed April 30, 2021; Burn Fitness-2, LLC, Chapter 11 Case No. 21-43840, filed April 30, 2021; Burn Fitness-3, LLC, Chapter 11 Case No. 21-43844, filed April 30, 2021.

supervision, and the financial and consulting professionals engaged in these matters; or based upon my experience, knowledge and information concerning the operations of the Debtors. I am authorized and qualified to submit this declaration on behalf of the Debtors and, if called as a witness, I would testify competently to the facts set forth in this declaration. Defined terms that I use that are not defined in my Declaration are defined in the related motions.

3. On April 30, 2021 (the "Petition Dates"), the Debtors, Burn Fitness, LLC, Burn Fitness-2, LLC and Burn Fitness-3, LLC (the "Debtors"), filed petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4. The Debtors continue in possession of their property and operating and managing their businesses.

## THE COMPANIES

5. The concept for Burn Fitness came about after I recovered from a particularly aggressive form of breast cancer in my late 20's. At the age of 27, I was diagnosed with advanced breast cancer. I underwent chemotherapy, radiation and multiple surgeries. I was determined to survive the cancer and live to see my then newborn son, and subsequent children, grow up. I discovered that exercise was a wonderful way to take care of myself and deal with the stresses of my illness. I believe exercise played a role in saving my life.

6. I determined that assisting others with health and physical fitness could help them overcome medical issues and live better lives. I set about to create an environment where that could happen. I connected with Mark DuFresne ("Mark"), who I knew from working at another gym. Mark has a special way of working with people, which makes them feel good. Mark and I decided that we should start our own fitness gym with the goal of being customer driven and to assist people in their health/fitness journey.

7. Our business philosophy is fairly simple: we focus on our members, we listen to our members, and we provide high end equipment, excellent trainers and classes, in an extremely clean and welcoming environment. We have changed peoples' lives through weight loss, their personal training goals and lifestyle changes.

8. Our staff is also very important to our operations. We maintain consistency and make sure all of our staff are well trained in the service they provide.

9. Among me, Mark, our staff and members, we have the feeling of having created a wonderful community.

10. The initial operation was formed and organized as Burn Fitness, LLC in April 2009. We opened a health and fitness center in Rochester, Michigan, and have had the same location since opening. I was the sole member of Burn Fitness, LLC until the formation of Burn Fitness Holdings LLC.

11. Burn Fitness-2, LLC, which operates a health and fitness center in Clawson, Michigan, was organized in April 2013, based on the success of Burn Fitness, LLC. I was the sole member of Burn Fitness-2, LLC until the formation of Burn Fitness Holdings LLC.

12. Shortly after the formation of Burn Fitness-2, LLC, with co-member Mark DuFresne, who has a 49% membership interest, we formed Burn Fitness Holdings LLC, which became the sole member of Burn Fitness, LLC, Burn Fitness-2, LLC and ultimately Burn Fitness-3, LLC. I have a 51% interest in Burn Fitness Holdings LLC.

13. Burn Fitness-3, LLC was formed in March 2017 and operates a health and fitness center in Livonia, Michigan.

14. Each entity operates independent of the others, and maintains separate bank accounts, separate financial records and separate payroll.

15. For an additional $5/month, members can visit any of the Debtors' three locations.

## THE NEED FOR CHAPTER 11 RELIEF AND EVENTS LEADING TO THE FILING OF THESE CASES

16. The Debtors were forced to close their facilities on March 16, 2020 as a result of the shutdown related to COVID-19. The impact of the shutdown has been devastating for the fitness/health and welfare sector. Statistically, 17% of health and wellness businesses in Michigan have closed their doors. As an industry, fitness

facilities have lost 50% of their members and on average have seen a decline in revenue of 58%.

17. For the Burn Fitness group, we operate on month-to-month memberships, which enable members to attend an unlimited number of classes for a fee of $45-60/month, and to work out for a fee of $34/month. We have experienced a reduction in members of approximately 60%.

18. All three facilities were completely closed from March 16, 2020 until September 9, 2020. In September, 2020, we were permitted to operate at 25% capacity, which means that we could have approximately 70 people in a facility at any given time, even though our facilities are built to accommodate up to 364 people.

19. We have had to limit some of the services we provide, such as classes (during some periods), number of machines in service, group training, and child care. All of these service reductions have had an impact on our members.

20. Additionally, while our facilities were spotless before the pandemic, now, we must engage in additional cleaning services, which not only adds costs, but limits the time that members can be in the facilities, to make sure that there is sufficient time for the daily cleaning routine and protocols.

21. On May 4, 2020, we obtained a Small Business Administration Paycheck Protection Program loan ("PPP Loan") for each location, as follows:

Burn Fitness, LLC: $75,400.00

Burn Fitness-2, LLC: $102,000.00

Burn Fitness-3, LLC: $48,752.00

These loans were fully utilized to pay payroll and utilities. The application for forgiveness of each of these PPP Loans has been submitted. We are awaiting confirmation of forgiveness of these loans.

22. Faced with the limitations of the PPP Loans at the time we obtained them, and the critical need for payroll due to the significant impact on our employees and independent contractors, there were insufficient funds from the PPP Loans to pay the landlords. As such, at that time, we started negotiating with our landlords for accommodations for the rent obligations, addressed infra, paragraph 26.

23. Once fitness centers were allowed to reopen, members were still terrified to return. Approximately 30% of our members cancelled their memberships. Once we began billing, another 15% of members cancelled. More members cancelled as a result of the mask mandates. Further, narratives were circulated in the media that gyms and similar facilities were not safe despite air quality studies and data from other previously opened states showing statistically zero spread of the virus. The PPP Loans got us through less than 3 months of payroll, but were a failure on many levels. Gyms/fitness centers are rent and payroll heavy; the amount allocated to the companies did not cover even part of one month's rent, and we were closed for six months.

24. Once we were able to reopen, we had no funds, forcing us to secure the SBA Disaster loans for each entity. In September 2020, each entity obtained an SBA Disaster Loan in the amount of $150,000.00 per Debtor. These loans proved tantamount to the survival of the Debtors. However, without the cooperation of the landlords, there was no way to avoid bankruptcy.

25. When the second round of PPP financing opened, we applied and each of the Debtors obtained a second PPP Loan on March 15, 2021 in amounts the same as for the first PPP Loans, which are being used for payroll and utilities.

26. The Debtors have a different landlord for each location. Prior to the pandemic, we were always timely with our rent, loan and trade creditor payments. Therefore, when COVID created the significant disruption to our businesses, we were hopeful that the landlords would recognize that we were in a unique circumstance which was out of our control, and work with us during this extremely difficult time. Despite the shutdown, I attempted to work out payment arrangements for each entity, with varying levels of cooperation or assistance from the landlords. The current status of matters with the landlords is as follows:

    a. Burn Fitness, LLC in Rochester: I believed that we had an arrangement with the landlord, but it was not finalized. Ultimately, the landlord instituted proceedings for eviction. A hearing on eviction is presently scheduled for May 10, 2021.

b. Burn Fitness-2, LLC in Clawson: The landlord has agreed to work with the company and has made accommodations on the amount of rent owed by deferring the arrearages of approximately $120,000; from October 1, 2020 until December 31, 2020, Debtor pays 25% of Base rent (approximately $15,500 per month) plus the triple net charges; from January 1, 2021, and continuing through June 30, 2021, Debtor pays the greater of 30% of Base rent or 13% of gross sales, plus the triple net charges. Debtor has remained current on this obligation. The arrearage remains on the books while we build our business back.

c. Burn Fitness-3, LLC in Livonia: The landlord would not agree to work with the company, and sued for a money judgment. The Court entered an opinion granting summary judgment in favor of the landlord. On April 15, 2021, the Court entered a judgment in the amount of $348,415.54 against Burn Fitness-3, LLC and the guarantors Burn Fitness, LLC and Burn Fitness-2, LLC. The landlord has filed an eviction action which is presently scheduled for May 3, 2021.

27. I believe that the relief that will be provided by the chapter 11 filings will enable the companies to successfully weather the remaining limitations of the pandemic and provide the opportunity for the companies to return to successful business operations.

## SUPPORT OF FIRST DAY MOTIONS

28. Concurrently with the filing of these Chapter 11 cases, the Debtors have filed a number of First Day Motions. I have reviewed each of these First Day Motions and I believe that the relief sought in each of them is necessary to enable the Debtors to operate in chapter 11 with a minimum disruption or further loss of revenue.

The First Day Motions, and the reasons for the relief requested therein, are summarized below.

<u>Debtors' First Day Motion Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Entry of Interim and Final Orders (A) Authorizing Use Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing on the Motion and (D) for Related Relief.</u>

29. The Debtors seek an order authorizing the use of their existing and incoming cash, which is subject to the perfected senior security interest of Comerica Bank and the secondary security interest of the U. S. Small Business Administration ("U.S. SBA") pursuant to an SBA Disaster Loan to each of the Debtors.

30. The Debtors rely on regular payments from their clients in order to operate, pay rent, pay compensation to trainers, teachers, independent contractors and employees and other expenses incurred in the ordinary course of their business operations.

31. The Debtors have an immediate need to use their cash collateral in order to operate, which funds will be used to pay their post-petition obligations of rent, payroll, compensation to independent contractors, and to obtain necessary supplies and services required to operate their businesses. Without the use of their cash collateral, the Debtors will not be able to operate. The use of Cash Collateral is required to fund, uninterrupted, the day-to-day operations of the Debtors' businesses and to preserve and maintain the value of the Debtors' estates and assets for the benefit of all parties in interest, including the Secured Lenders.

32. Through the continuation of operations, the Debtors will be able to replace used cash and accounts, such that the Secured Lenders' security interests in the Cash Collateral will be relatively the same as existed on the Petition Date. There will be no material erosion of the interests in the Debtors' assets constituting cash collateral, and the Secured Lenders will not suffer any harm by reason of the relief requested by the Debtors. The Debtors will use the cash collateral only in the ordinary course of business and to the extent necessary to avoid immediate and irreparable harm in accordance with the terms and conditions proposed in the Motion and as set forth in any order entered in connection therewith.

33. Comerica Bank is secured in all assets of each Debtor. Debtors believe that the personal property of each of the Debtors, along with the current monthly payments in accordance with the terms of the loan documents, the granting of a post-

petition lien in the same priority and validity as it had pre-petition, and the reporting requirements set forth in the Consent Order are sufficient and appropriate adequate protection of Comerica's security interest.

34. The Debtors currently do not have any payment obligations to the U.S. SBA. Therefore, Debtors believe that adequate protection to U.S. SBA, as the second priority secured lender, will be satisfied by the granting of a post-petition lien in the same priority and validity as it had pre-petition.

<u>Debtors' First Day Motion for Entry of an Order Authorizing Payment of Certain Pre-Petition (i) Wages, Salaries and other Compensation, (ii) Employee Medical and Similar Benefits, (iii) Reimbursable Employee Expenses<br>and (iv) Other Benefits.</u>

35. The Debtors seek an order authorizing the payment of current payroll for the pre-petition period, which did not get paid as a result of the timing of the filing of these chapter 11 cases.

36. Payroll includes approximately 45 salaried employees and 19 Independent Contractors, among all three facilities. The Employees perform a variety of critical functions for the Debtors, including direct retail sales, customer service, performing general and administrative services and other related tasks, and general management of the Debtors' businesses. The Independent Contractors perform a variety of critical functions for the Debtors, including direct customer service, personal training, and fitness classes. The Employees' and Independent Contractors' skills, knowledge, and understanding of the Debtors' business

operations, and particularly their customer service abilities, are essential to the effective operation of the Debtors' businesses.

37. The Debtors also seek authority to (i) pay related payroll taxes for all payroll; (ii) reimburse their Employees and Independent Contractors in the ordinary course of business; and (iii) to pay accrued benefits and to continue benefit programs such as health insurance.

38. No Employee or Independent Contractor is owed wages of more than the $13,650.00 per Employee cap contained in §§ 507(a)(4).

39. No Employee or Independent Contractor is owed contributions to an employee benefit plan of more than the $13,650.00 per Employee cap contained in §§ 507(a)(5).

<u>First Day Motion for Entry Order Authorizing Continued Use of Existing Bank Accounts, Business Forms and Cash Management System, and to Receive, Process and Honor Credit Card Transactions.</u>

40. The Debtors, in the ordinary course of their businesses, use a cash management system (the "Cash Management System") to collect, transfer, and disburse funds and accurately record such transactions.

41. All funds collected by the Debtors are deposited into their respective Comerica Bank Checking Accounts (the "Accounts"). All paper checks drawn by the Debtors are presented to and cleared through Comerica Bank, and all forms of deposits are deposited into the Accounts. All forms of electronic payments are paid

out of the Accounts as well, including ACH payments made to ADP, who is the third-party payroll services provider that administers the Debtors' payroll and disburses payroll funds to the Debtors' employees.

42. The Debtors' Cash Management System has been employed for some time and constitutes an essential business practice. The use of this system provides numerous benefits to the Debtors, including the ability to control and monitor corporate funds, to ensure cash availability, and to reduce administrative expenses by facilitating the movement of funds. The forced closure and reopening of the Debtors' Accounts would be costly to the Debtors, significantly disruptive to its operation, and potentially damaging to its business relations with customers, vendors, and employees.

43. Additionally, in the ordinary course of business, the Debtors use a number of business forms, including checks, letterhead, membership contracts and the like. If the Debtors were required to obtain all new business forms as a result of the filing of these cases, the Debtors would incur significant expense and attendant delay in effectuating their ordinary course, post-petition business transactions.

44. The Debtors are a party to an agreement with Merchant Services governing the processing, settlement and authorization of Visa, MasterCard, and American Express. Additionally, the Debtors are a party to an agreement with

American Express which provides for the processing, settlement, and authorization of that credit card at the Debtors' health and wellness centers.

45. Virtually all of services provided by the Debtors are purchased with credit cards, and the Debtors' continued ability to honor and process credit card transactions is essential to the Debtors' business operations. Under the terms of their agreements, the Debtors are required to pay the credit card companies fees for their services, certain amounts which may have accrued by and remain unpaid as of the Petition Date.

46. Further, the Debtors run expenses through the American Express card in the name of Burn Fitness, LLC, Account No. xxxxx 5-23009 (the "American Express Card"). In the ordinary course of business before the Petition Date, charges for all of the Debtors would be placed on the American Express Card, and would either be split three ways, if for a common service, or the appropriate Debtor would pay the charge incurred for that specific entity. Ordinary course expenses, such as cable tv, internet, cleaning services and many others have been set up for "auto pay" on the American Express Card.

47. Maintaining Credit Card Processing is important for the success and ultimate viability of the Debtors' businesses and is necessary to avoid immediate and irreparable harm to the Debtors and their estates. The success and viability of the Debtors' businesses is dependent upon the ability to accept credit card payments.

03418846 v1                                14

21-43828-mar    Doc 9    Filed 04/30/21    Entered 04/30/21 13:57:17    Page 14 of 20

The Debtors believe that continuing the Credit Card Processing will ensure that the Debtors will maintain a key method of accepting customer payments and will assist the Debtors in preserving customer relationships.

48. The Debtors seek entry of an order (i) authorizing the Debtors to maintain their existing bank accounts, checks (until suitable replacement checks can be reasonably obtained), and business forms without being required to close such accounts and forms and re-open new ones, (ii) authorizing the Debtors to continue using their cash management system, (iii) authorizing the Debtors' bank to accept and rely upon Debtor's notices and instructions as to which pre-petition checks can be honored pursuant to any Order(s) entered by this Court and which checks must be dishonored, (iv) authorizing the Debtors to continue to receive, process, and honor credit card transactions ("Credit Card Processing"), pay fees necessary to continue Credit Card Processing, and (v) continue to use the American Express Cards for payment of ordinary course expenses, allocated among the three entities in accordance with their responsibility for the particular expense.

The Affidavit is also submitted in support of other motions which will be filed in this matter including, but not limited to the following:

<u>Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 366: (i) Prohibiting Utilities from Altering, Refusing or Discontinuing Services Pending Determination of Adequate Assurance of Payment for Future Utility Services and (ii) Establishing Procedures for Determining Requests for Additional Assurance.</u>

49. Utility services—gas, electric, water, phone, internet and other similar utility services (collectively the "Utility Services")—are essential to the Debtors' ability to operate in their chapter 11 cases. Any interruption of the Utility Services, even for a brief period of time, would severely disrupt the Debtors' business operations and would be extremely harmful to its customer relationships, revenues, profits and ultimately its ability to maximize payments to its creditors. It is therefore critical that all Utility Services continue to be provided to the Debtors uninterrupted.

50. The Debtors are, and have been, current on their pre-petition utility payments. Therefore, Debtors are offering to each Utility Company a deposit in the amount of the average monthly cost for such utility as adequate assurance of future performance.

51. The Debtors seek entry of an order (i) determining that a deposit of the average monthly cost for each Utility Company constitutes adequate assurance of payment for future utility services pursuant to §§ 366(b) and (c) of the Bankruptcy Code in the amounts set forth on Exhibit 2 to the Motion; and (ii) providing that if a Utility Company, during the 20-day period prescribed by § 366(b) of the Bankruptcy Code, asserts that it is not satisfied with adequate assurance of payment from the Debtors as proposed, such Utility Company shall, within 14 days from the date of entry of the Order on this Motion, send the Debtors and their undersigned counsel a written notice of its intent to discontinue services and that Debtors shall have ten

(10) days after such notice to resolve any dispute with the Utility Company. If there is no resolution of the dispute within said 10-day period, the Utility Company, on expedited request and with notice and opportunity for response, can seek to terminate service. However, the Utility Company shall not have authority to terminate service without specific approval of this Court, on notice and opportunity of Debtors to respond.

52. The proposed procedures will ensure that the Debtors are able to continue their Utility Services without prejudice to the Utility Companies and will enable the Debtors to continue to operate without concern that their Utility Services will be terminated.

<u>Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Maddin, Hauser, Roth & Heller, P.C. as Counsel to the Debtors.</u>

53. The Debtors seek to employ Maddin Hauser Roth & Heller, P.C. ("Maddin Hauser") as their counsel. The Debtors selected Maddin Hauser as their attorneys because of Maddin Hauser's experience and knowledge in the field of debtors' and creditors' rights and business reorganization under chapter 11 of the Bankruptcy Code.

54. The professional services Maddin Hauser provides to the Debtors will include, but will not be limited to, the following:

    a. Advising the Debtors with respect to their rights, powers and duties as debtors and debtors in possession in the continued management and operation of their financial affairs and property;

b. Assisting in the preparation of schedules and statements of financial affairs;

c. Assisting in the preparation of financial statements, balance sheets and business plans;

d. Attending meetings and negotiating with representatives of creditors and other parties in interest;

e. Advising and consulting with the Debtors regarding the conduct of these cases, including all of the legal and administrative requirements of operating in chapter 11;

f. Advising the Debtors on matters relating to the evaluation of unexpired leases and executory contracts;

g. Taking all necessary action to protect and preserve the Debtors' estates, including the prosecution of actions on their behalf, the defense of any actions commenced against their estates, negotiations concerning all litigation in which the Debtors may be involved and objections to claims filed against the estates;

h. Assisting the Debtors in selling assets pursuant to §363 of the Bankruptcy Code and drafting agreements and court papers to accomplish same, including, without limitation, negotiating and preparing a purchase and sale agreement;

i. Assisting in formulating and prosecuting a plan of reorganization and disclosure statement, along with all related agreements and/or documents, and taking any necessary action on behalf of the Debtors to obtain confirmation of a plan of reorganization;

j. Appearing before this Court and the Office of the United States Trustee, and protecting the interests of the Debtors' bankruptcy estates before the Court and the Office of the United States Trustee; and

k. Performing all other necessary or appropriate legal services and providing all other necessary legal advice to the Debtors in connection with these chapter 11 cases, including analyzing interests, liens, leases, and contracts and advising the Debtors on corporate and litigation matters.

55. Maddin Hauser currently does not represent any other entity in connection with these proceedings. Maddin Hauser previously represented Grand Sakwa Property Management or one of its affiliates in 2017 and early 2018 relative to negotiating leases for tenants at North Hill Center, Rochester Hills, MI,

Northridge Center, Rochester, MI, and a lease and sale of real property at Heritage Village, Warren, MI. The engagement concluded in April, 2018; none of these matters pertained to any of the Debtors and were unrelated to the instant proceedings. One of the attorneys of Maddin Hauser, Deborah S. Lapin is married to Paul Randel, the Assistant United States Trustee for the Eastern District of Michigan. Ms. Lapin has not and will not perform any legal work on behalf of the Debtors, nor does she have any knowledge of any aspect of these chapter 11 proceedings. The attorneys of Maddin Hauser otherwise have no connection with any of the forgoing parties. Maddin Hauser is otherwise a disinterested entity, and holds no interest adverse to the interests of the Debtors and their estates, the creditors of the Debtors, their respective accountants and attorneys, the Office of the U.S. Trustee, and the employees of the U.S. Trustee.

56. Pursuant to §328(a) of the Bankruptcy Code, the Debtors may retain Maddin Hauser on any reasonable terms and conditions. The Debtors have agreed that Maddin Hauser will be paid its customary hourly rates for services. The hourly rates for the attorneys who will, or may, work on this matter, are set forth below and in the Declaration of Julie Beth Teicher attached hereto as Exhibit 2.

| | |
|---|---|
| Earle I. Erman | $485.00 |
| Julie Beth Teicher | $435.00 |
| David H. Freedman | $410.00 |
| David M. Eisenberg | $385.00 |

57. Maddin Hauser is customarily reimbursed for all expenses it incurs in connection with its representation of a client in a given matter.  Such expenses include, without limitation, travel costs, telecommunications, express mail, messenger service, photocopying costs, document processing, computerized research, court fees and transcript costs.

58. Maddin Hauser acknowledges that all amounts paid to it during this chapter 11 case are subject to final allowance by this Court.  Maddin Hauser intends to apply to the Court for the allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules and Local Rules for all services performed and expenses incurred after the Petition Date.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: April 30, 2021  /s/ Alyssa Tushman
Alyssa Tushman

MADDIN, HAUSER, ROTH & HELLER, P.C.

By: /s/Julie Beth Teicher
David M. Eisenberg (P68678)
Julie Beth Teicher (P34300)
Proposed Counsel for Debtor
28400 Northwestern Hwy., Suite 200
Southfield, MI  48034
(248) 354-4030
deisenberg@maddinhauser.com
DATED:   April 30, 2021    jteicher@maddinghauser.com